**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **v.** | ) | **DOCKET NO.: 23-10198-ADB** |
| **MICHAEL RILEY (13),** | ) | |
| **Defendant.** | ) | |

# DEFENDANT RILEY'S SENTENCING MEMORANDUM AND INCORPORATED MOTION FOR DEPARTURE AND/OR VARIANCE FROM THE SENTENCING GUIDELINES[1]

NOW COMES the defendant, Michael Riley, ("Riley"), through counsel, and hereby moves this Honorable Court for a downward departure and/or variance pursuant to 18 U.S.C. § 3553 from the otherwise applicable guideline range both as recommended by the Probation Department in the Presentence Report, ("PSR"), and/or from the defendant's final Guideline Sentence as determined by the Court. The defendant also submits the instant Memorandum in support of the factual

[1] Riley has contemporaneously filed a Motion to Strike Portions of the PSR (ECF#689) which is incorporated herein by reference.

challenges and the legal issues raised in his suggested revisions to the PSR. In support thereof, counsel states the following:

## INTRODUCTION

Riley is 48 years old and his sentencing is complex due to the following mitigating circumstances:

1. He has been incarcerated for 1/3 of his life.
2. The PSR presents unproven facts as offense conduct.
3. The PSR applies the lesser burden of proof of preponderance of evidence to predicate acts instead of the constitutional burden of proof beyond a reasonable doubt as to two alleged shootings.
4. There is no preponderance of evidence that Riley was involved in either alleged shooting.
5. There is no direct evidence that Riley was involved in the two alleged shootings.
6. Riley is not a career offender.
7. Riley's criminal record is ancient and overstated.
8. The Federal Sentencing Guidelines – perhaps more broken than inadequate, DO NOT afford adequate consideration to offenders with

mental health, substance abuse or extreme socio-economic and family circumstances.

9. Additionally, the Guidelines create an arbitrary and unrealistic structure for individuals charged with RICO predicates involving alleged crimes of violence by lowering the burden of proof without accounting for alleged roles of comparable offenders or significant holes in the government's cases.
10. The career offender guidelines do not adequately consider ancient conduct for which documented systemic flaws in the criminal justice system effected individual rights to achieve a fair resolution that did not inhibit them 30 years later.
11. The Guidelines do not afford adequate consideration of the age of a defendant when compared with their life expectancy.

Fortunately, Congress has given the Court 18 U.S.C. § 3553 as a means of balancing all of the complex issues surrounding Riley's sentence.

**ARGUMENT**

Riley grew up in the Bromley-Health Housing Complex in Jamaica Plain. The residents of Bromley-Heath historically constitute an oppressed and neglected

segment of Boston's public housing population that were both denied police and City services while at the same time being oppressed by them. (See Exhibit 1, attached hereto, Public Safety Reimagined: The Rise and Fall of the Bromley-Heath Patrol). Regardless of the origination and/or cause of the conditions afflicting Bromley-Heath, these are the conditions that Riley grew up in and which had a great impact on his life. Not surprisingly, Riley's early childhood was tragic as he orphaned by the age of 14 and abused his extended family to whom his care was entrusted when his mother died of cancer. As a teenager, his aunt would make him purchase drugs for her.

## A. RICO PREDICATE ACTS MUST BE PROVEN TO THE SENTENCING COURT BEYOND A REASONABLE DOUBT.

The two alleged shootings on October 9, 2016 and December 9, 2016 are predicate acts for the Count 5 RICO that Riley has pleaded guilty to. (Count 5 ¶ 7(b)). However, Riley did not agree at his change of plea hearing that he was guilty of those charges and, on the contrary, denies involvement in them. Instead, Riley pleaded guilty to a predicate drug conspiracy. (Count 5, ¶ 7(a)). As a result, the government must prove the predicate attempted murders beyond a reasonable doubt before Riley can be sentenced for either or both of them. *United States v. Simon,* 12 F.4th 1, 28-32 (1st Cir. 2021).

The PSR erroneously treats predicate acts as if they were relevant conduct while referring to them as both “offense conduct”, (PSR, p. 8), and as “predicate offenses”, (PSR, p. 48). As a result, this Court must apply U.S.S.G. § 1B1.2(d) which requires the sentencing court to treat a conviction for a conspiracy to commit more than one offense as “a separate count of conspiracy for each offense that the defendant conspired to commit.” Obviously, Riley’s plea to the drug predicate is treated as a separate conspiracy under this section. However, where Riley has not pleaded guilty nor been found guilty of the alleged shootings, Application Note 4, (Formerly Application Note 5), instructs the sentencing court that it can only sentence Riley for unadjudicated conspiracy conduct, “if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.” *United States v. McKinley,* 995 F.2d 1020, 1026 (11th Cir. 1993)(Application Note 5, (now Note 4), applies the higher standard of proof beyond a reasonable doubt in conspiracy cases where the jury’s verdict di not establish which of the offenses were the object of the conspiracy); *United States v. DiGiorgio,* 193 F.3d 1175, 1177-78 (11th Cir. 1998)(applying *Mckinley* to RICO

conspiracy where jury's general verdict did not indicate which predicate acts it believed the defendants had committed).[2]

### B. IT IS ERRONEOUS TO LABEL THE ALLEGED SHOOTINGS AS "ATTEMPTED MURDERS" UNDER THE SENTENCING GUIDELINES.

The Guidelines fully recognize that just because a firearm is discharged does not mean that it is an "attempted murder" or conspiracy. U.S.S.G. § 2A2.2 has a base offense level of 14 and contains adjustments for aggravated assault that include a +5 for the discharge of a firearm and a +7 for life threatening injury which are capped at +10. Neither of the shootings described in the PSR can be characterized as anything but spontaneous occurrences that did not require planning or preparation. In fact, the December 9, 2016 shooting is described by witnesses as an argument between two groups of men and described by police as an ABDW.

Likewise, the October 9, 2016, incident is described without evidence as a turf battle between two rival street gangs. The fact that an innocent third party was hit by a stray bullet does not make it an attempted murder.

As a result, the correct calculation for the shootings results in an Adjusted Offense

---

[2] Counsel is aware of *United States v. Carrozza,* 4F.3d 70, 80-81 (1st Cir. 1993), and other cases which tend to focus on the sentencing court's consideration of uncharged RICO conduct as "relevant" conduct. It is respectfully submitted that the only the 11th Circuit appears to have correctly identified the distinction between unresolved predicate acts as an object of the conspiracy and uncharged conduct in applying the correct section of the U.S.S.G. and thereby requiring proof beyond a reasonable doubt of charged conduct under Application Note 4.

Level of 24. (14 + 10 = 24).

C. **THERE IS INSUFFICENT EVIDENCE LINKING RILEY TO THE OCTOBER 9, 2016 ALLEGED SHOOTING.**

It is important to note at the outset that Riley was not living in Boston at the time of this early morning shooting, he was living in Brockton. There is no evidence that identifies Riley as a shooter or even being present at the time of the shooting. The fact that a car allegedly observed leaving the scene by unknown individuals is similar to a car that was observed in other locations visited by Riley **FOUR MONTHS LATER** does not even approach the level of probable cause to believe that Riley was involved let alone was present at the scene and was a shooter.

It is not clear from the PSR or discovery how law enforcement was able to determine the alleged targets or their gang affiliation.

Riley was never identified by anyone as a shooter or even being present at the time of the shooting. There is no evidence that Riley ever owned a grey Saturn Ion. Moreover, discovery provided indicates that a grey Saturn Ion was stopped by police after the shooting, was driven by another individual and owned by still another individual. While Riley's P.O. may have taken a picture of a Saturn at a later date, there is no evidence that connects Riley to the shooting or the Saturn. Moreover, if the Brockton police did see a Saturn at Riley's alleged residence, no photograph has been produced.

None of the individuals in the poor quality video surveillance look anything like Riley.

The facts in this paragraph are inconsistent. It is alleged that Finch was both operating a white car as a "spotter car", but exited the Saturn with the shooter? The reports also describe two guns and two shooters. This does not make any sense.

There is literally no evidence that Riley was operating a Saturn on the day of the shooting and/or was anywhere near the shooting. It is patently unfair to use Finch's alleged GPS coordinates to implicate Riley.

While it is true that on November 7, 2016, a woman was arrested at a government building security station for possessing a handgun, but her description of how that happened is not credible in that she claims it must have been planted on her without her knowledge while she was at Heath Street. Riley was not with her when she was arrested and no reference is made to Riley. Four months later, Riley's PO took a photograph of Riley sitting with the woman and a photograph of an alleged Saturn driving in a parking lot without any identifiable occupants inside. There is no evidence of the extent, length and nature of Riley's relationship with the woman.

In addition to other third party individuals found to be in possession of a Saturn and a gun, there was still another codefendant, (not Riley or Finch), who posted a video of himself with a gun that was used in the shooting which was ultimately found in the possession of yet another individual, (not Riley or Finch).

In addition, the vehicle registration numbers on the Saturn that was stopped and searched later on in the police investigation do not match the registration numbers on the Saturn allegedly used by Riley. This does not promote any confidence in the linking of the Saturn to the crime or Riley to the Saturn.

Lastly, any alleged expert ballistics evidence has been severely questioned by high courts and found to be unreliable. *Commonwealth v. Williams,* 498 Mass. 321 (2026)(Commonwealth failed to meet burden of establishing that expert testimony on gunshot residue was reliable); *Abruquah v. State,* 483 Md. 637 (MD 2023)(theory of firearms identification was not sufficiently reliable basis for unqualified expert opinion); *People v. Ross,* 68 Misc.3d 899, 918 (NY 2020) (firearms examiner may not offer quantitative opinion on matters not adequately supported by the scientific community). It is far from conclusively established that any gun can be "ballistically linked" to any shooting. As a result, the Court should discount any purported ballistics evidence in this case.

D. **THERE IS INSUFFICIENT EVIDENCE LINKING RILEY TO THE DECEMBER 9, 2016 ALLEGED SHOOTING**.

Riley was acquitted of this crime in Suffolk Superior Court. (PSR, paragraph 142)(See Exhibit #2, attached hereto). Again, it is important to note that Riley was not living in Boston at the time of this early morning shooting, he was living in Brockton. There is no evidence that identifies Riley as a shooter or even being present at the time of

the shooting. Moreover, neither the alleged victim and nor the only eyewitness to the shooting could identify Riley as being involved. Moreover, the witness insisted that there was a physical altercation between the alleged victim and alleged shooter prior to the shooting which lends itself to a significantly less culpable explanation for the shooting other than attempted murder. Likewise, the underlying crime is described by police as an ABDW throughout the police reports and not an "attempted murder" or conspiracy.

1. **The Initial Report**

Specifically, the initial 911 call at 4:09 AM on December 9, 2016, was from the victim's tow truck partner who reported that:

> **CLR STS 2 SHOTS FIRED..OUTS ABV..**
> **SUSPECT WAS WEARING A BLK JACK..GRY SWEATER.**
> **MALE SHOT OUTS ABV**
> **CLR IS W/ A TOWING CO.**
> **PARTNER WAS SHOT..TWICE..UNKN WHERE ON HIS PERSON**
> **NOW STS THERE WERE 2 SUSPECTS**
> **SUSPECTS RAN INTO THE REAR OF THE ABV PROPERTY**
> *[960 PARKER]*
> **NO INFO ON 2ND MALE**

Additionally, a Boston Police report by Det. Richard Lewis describes an argument between a tow truck driver and two black men as occurring immediately prior to the shooting. One of the black males then allegedly shot the victim twice. The other black male is not described as having done anything other than being present and leaving the scene. Consistent with this single shooter description, the initial caller described 2 shots fired by single "suspect" wearing a black jacket and grey sweater. The witness then

changed his mind and said that there were 2 suspects, but had no description of the second suspect. Indeed, the videos from inside a building on the same date as the as the shooting depict one individual with a black jacket and grey hoodie. Additionally, the buildings in which the videos were culled belong to a large housing development in which hundreds of people live. Because of the destruction of evidence, it is not known how many individuals were wearing similar hoodies on a cold night in December, but it is likely that there were many. There is no reference to red pants or a white hoodie during these initial reports.

**2. Red Pants & White Hoodie**

At some point the description of the shooter changed from having a grey sweater to white hoodie & the addition of red pants. Almost an hour and a half after the shooting at 5:28 AM, an individual named Teodoro Abad called 911 to report the shooting and his observations. Mr. Abad clearly did not witness the shooting but saw individuals run by his window after he heard the shots. He requested a Spanish speaking officer to give a statement. In summary he reported to 911 that he saw one of the individuals he saw run by his window hanging out a "Comello's" at 1:00 AM, nearly three hours prior to the shooting. He described the individual as follows:

> **SUSPECT WAS A BLK MALE..WEARING BLK JACK, GRY SHIRT, RED PANTS…CLR NEVER SAW S GUN.**

Thereafter, Abad is not interviewed until December 18, 2016, where he qualifies his original report by stating that he does not know if the two people who ran past his window were involved in the shooting. He once again asserts his belief that he was the individual with the red pants before the shooting, but now states that it was a midnight or 12:30 and advises the police to check Camillo's videos. Presumably, this resulted in the police seizure of the Camillo video. Upon seizing the video, the police obviously noted that the hoodie on the individual that the government says is Riley, is white and not grey. This resulted in the victim his partner adopting the white hoodie description.

Moreover, neither the Camillo videos or still shot photographs clearly depict Riley who was ultimately acquitted of the shooting and all other charges. (Exhibit 2). The surveillance footage from Camillo's is not dispositive of anything other than a black male was in the vicinity several hours before the alleged shooting wearing a white hoodie, black jacket and orange or red pants. This is insufficient evidence that this person was Riley and/or that this person was involved in the alleged shooting, was the alleged shooter, just a bystander or a person who understandably may have fled the scene of an alleged shooting. It would have been a normal reaction for anyone present to flee an alleged shooting. At worst, being present in the vicinity of a crime 4 hours before the crime and fleeing after the crime cannot constitute probable cause.

There are also important missing surveillance videos including the video from which the still photos from inside the apartment complex were obtained. A second

missing video which is believed to have shown the actual shooting was also not preserved. Law enforcement is responsible for this spoiliation and should not be permitted to rely on still footage to argue Riley's involvement. The missing videos were addressed in Riley's Suffolk Superior Court trial in which he was found not guilty. (See Exhibit #1, Motion to Strike Portions of PSR [ECF#689]. Riley's sentence should not be increased based upon this shaky, shoddy police work and evidence when he was already acquitted. (Exhibit 2).

**E. THE GUIDELINES DO NOT AUTHORIZE THE GROUPING OF RICO PREDICATES AS IF THEY ARE COUNTS**

Riley has pleaded guilty to a single count of conspiracy to commit racketeering offenses. Section 3D1.1(a) authorizes grouping only when "a defendant has been convicted of more than one count." As a result, there is no legal basis for the Court to employ a Guidelines grouping analysis for determining the defendant's Guideline calculation. The clear and unambiguous use of the term "count" as used in § 3D1.1(a) cannot be undone by pretending that "predicates" are "counts".[3] *Milner v. Department of the Navy,* 562 U.S. 562, 574 (2011)("[w]hen presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language."). Indeed, the Supreme Court has similarly held that a "when the statute's

[3] Counsel is very mindful of the time and effort that the Probation Department puts in to attempting to correctly apply the Guidelines and, in particular, to calculate "grouping" in cases such as Riley's. Nothing said herein is intended to insult or denigrate that process or the effort involved. However, the use of the word "count" in § 3D1.1(a) cannot simply be ignored.

language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004), quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). Therefore, grouping applies to counts of conviction, not racketeering predicates. Of course, the Court may use the Grouping methodology as part of its analysis under 18 U.S.C. § 3553 as a guide. For the reasons stated below, the Court is respectfully urged not to use the Grouping analysis at all in determining the defendant's sentence.

In addition, the government should also not be able to both charge Riley for participating in a racketeering organization and harvest additional criminal history points for offenses committed during that same period of time. This is double counting. Probation has responded to this objection by erroneously stating that the RICO conspiracy only includes 2016 and 2020-24. (PSR, p. 54). This explanation ignores the fact that the historical context of Heath Street is referenced in the same PSR as commencing in the "1980s". (PSR, p. 8, ¶ 15). The government can't have it both ways by indicting an older man like Riley in a RICO conspiracy with a younger group of men and excluding Riley's older history as predating the conspiracy. Such a result is unjust, unfair and defies logic.

Paragraph 129, should not count at all because it is a 1997 conviction that is too old. The only potential reason for counting it is because of the draconian 8 year sentence

that Riley received for a probation violation. This should never have occurred and would not happen again today. Even the description of the crime exaggerates its severity. There is no way stabbing someone in the rearend should ever be charged as an "armed assault with intent to murder."

Paragraphs 131 and 132 are also too old and over charged and should not result in 9 total CHC points. This should also be considered under 18 U.S.C. § 3553.

Lastly, the designation of Riley as a Career Offender speaks to the failure of the Guidelines to properly account for convictions that are decades older than the offense of conviction, as in Riley's case. Indeed, Riley's newest CHC scored offense occurred in 2001! Ancient convictions should never count individually or collectively so as to render a defendant a Career Offender.

As a result of the foregoing, the defendant's Total Offense Level should be 24 with a Criminal History Category of II. Therefore, his sentencing range is 57-71 months.

### F. TRAGEDY HAS CERTAINLY PLAYED A ROLE IN RILEY'S, CRIMINAL HISTORY, MENTAL HEALTH AND SUBSTANCE ABUSE.

As set forth in paragraph 146 of the PSR, Riley's mother died when he was just 14. Riley did not have a close relationship with his father because his father was incarcerated for much of Riley's childhood. Riley's father died from a stroke in 2011 while Riley was incarcerated.

Riley's stepfather was physically and emotionally abusive to Riley and his mother from age five until approximately age 12 when she ended the relationship because of the abuse. The abuse resulted in police involvement.

### G. RILEY'S OFFENSE OF CONVICTION AND CRIMINAL HISTORY ARE LESS SERIOUS THAN CONTEMPLATED BY THE SENTENCING GUIDELINES

Criminal justice reform is happening, but not a fast enough pace to adequately address the nuances of Riley's case. Substance abuse is a factor in this case. Job placement is delayed by incarceration. Family assistance is delayed. Riley is 48 years old and will have limited employment options after this conviction. The sooner he continues earning income, the better he will be able to care for himself and the better support he will have to maintain sobriety. *Gall v. United States,* 552 U.S. 38, 59 (2007)(acknowledging that in some cases, a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing).

#### 1. Application of *Gall Factors*

Accordingly, this Court may consider any apparent discrepancy in deciding whether to depart or construct a variance pursuant to 3553 from the Guideline

sentence. The sentencing guidelines are advisory, not mandatory. *United States v. Booker*, 543 U.S. 220 (2005). Federal Courts are now free to tailor individual sentences in light of the factors set forth in 18 U.S.C. 3553 (a), which includes the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the Defendant; (2) the need for the sentence imposed-(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the Defendant; and (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment ...; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of Defendant as set forth in the guidelines ...; (5) any pertinent policy statement ...; (6) the need to avoid unwarranted sentence disparities among Defendants with similar records ...; and (7) the need to provide restitution to any victims of the offense.

18 U. S. C. 3553 (a)(2)(A)(B)(C)(D). The Supreme Court's decisions in U*nited States v. Booker,* 543 U.S. 220 (2005), *Kimbrough v. United States,* 552 U.S. 85 (2007), and *Gall v. United States,* 552 U.S. 38 (2007), expand the basis for non-guidelines sentences to include all offender and offense characteristics and to include policy problems in the applicable guidelines, and requires judges to impose

a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing.

In *Gall,* the court set forth a three step procedure: First, begin all sentencing proceedings by correctly calculating the applicable Guidelines range. Second, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should consider all of the 3553(a) factors to determine whether they support the sentence requested by a party. Third, the judge should explain. *Gall*, 552 U.S. at 50.

**2. Restorative Justice**

For lack of a better description there is something about Riley's criminal record that is very troubling and needs to be addressed by the Court. He was incarcerated for 15 years. Prior to that time he was over charged and over sentenced. He has no convictions since his release in 2015. Riley's record speaks to a different type of law enforcement activity that has since been criticized and hopefully abandoned. This amount of disruption to an individual's life combined with the trauma of each arrest certainly effected the formative early stages of Riley's life, his employment, his relationships and his view of himself.

In the instant case, the Court is urged to impose a sentence that is reflective of all the 18 U.S.C. § 3553 criteria, but emphasizes the defendant's exaggerated criminal history, substance abuse rehabilitation, family characteristics and good deeds.

H. **THE TOTALITY OF THE CIRCUMSTANCES WARRANT A VARIANCE PURSUANT TO 18 U.S.C. SECTION 3553.**

As set forth in Part B of the PSR and the letters of support, Riley had a difficult life and has been dealing with many overlapping issues in addition to being incarcerated for more than 1/3 of his life. Not only was he orphaned at a young age, but he was unjustly charged with manslaughter as a result of his best friend's death in a fight between two groups of individuals.[4] (PSR ¶ 131). The balance of Riley's record at ¶¶129-130 & 132 may all be characterized as street level crimes where larcenous or assaultive behavior led to an exaggerated result and exaggerated charges. For example, assault with intent to murder should never be charged for stabbing someone in the rearend. Likewise, the attempted thefts in ¶130 and ¶132 resulted in assaults when the victims may have fought back, but

[4] Riley pleaded guilty to this charge to save his friend's family from being drawn into court and reliving their son's death.

that was not the original intent. Regardless, a sentence of 15 years served for these crimes is outrageous. It is also important for the Court to note that during this time period it was customary in the City of Boston and elsewhere to over charge black men for their crimes resulting in outrageous sentences. Several of these cases were also based on victim identifications which we now know are fundamentally flawed.[5]

The letters of support and PSR establish that he provides critical support for family members. Likewise, in *United States v. Roselli,* 366 F.3d 58, 69-70 (1st Cir. 2004), the First Circuit denied a government appeal where the district court had granted a departure for extraordinary family circumstance in a case involving 2 children with serious medical conditions. More recently, the First Circuit has affirmed that a departure or variance for exceptional family circumstances exist where the defendant's caretaking is "irreplaceable" to the family. *United States v. Herman,* 848 F3d 555 (2017).

[5] For comparison purposes, the Court should also note that the conviction described in ¶ 132 was a shooting during a robbery. However, it was properly characterized and charged as an ABDW and not as an attempted murder as with the October 9, 2016 and December 9, 2016 alleged shootings.

A combination of the above factors may constitute a separate basis for departure. *Koon v. United States*, 518 U.S. 81, 113-14 (1996); *United States v. Sklar*, 920 F.2d 107, 117 (1st Cir. 1990).

## I. SENTENCING RECOMMENDATION

For the reasons set forth herein, locking Riley up for any period of time would serve very little to promote respect for the justice system given the length of his prior incarcerations. Therefore, counsel respectfully requests a sentence of 96 months.

## CONCLUSION

Based upon the foregoing arguments and authorities this Honorable Court is respectfully urged to impose a sentence consistent with the arguments set forth herein.

Respectfully submitted,

Peter Charles Horstmann, Esquire
BBO #556377
21 Highland Circle, Suite 202
Needham, Massachusetts 02494
(617) 519-9011

**CERTIFICATE OF SERVICE**

I, Peter Charles Horstmann, Esquire, hereby certify that on this 23rd day of October, 2026, a copy of the foregoing SENTENCING MEMORANDUM was served electronically, upon AUSA Michael Crowley, 1 Courthouse Way, Boston, MA 02110.

Peter Charles Horstmann, Esquire