# EXHIBIT 1

# Public Safety Reimagined: The Rise and Fall of the Bromley-Heath Patrol

**Jasmine N. Olivier**, *Harvard University, Department of Sociology*

**Abstract**
In this sociological study, I compare the organizational approaches to public safety issues within public housing between community-controlled institutions (e.g., Bromley-Heath tenant management corporation (TMC)) and state-controlled institutions (e.g., Boston Police Department (BPD) and the Boston Housing Authority (BHA)). I find that as federal, state, and local criminal legal policies became more punitive from the 1970s onward, the BHA and the BPD took increasingly punitive approaches to evictions and arrests, respectively. In contrast, the Bromley-Heath TMC management and patrol maintained rehabilitative approaches to public safety. They prioritized social services over evictions and arrests. I argue that TMC staff took a softer approach to public safety than did state actors due to their *negotiated coexistence*[1] with crime-involved residents. I address the implications of these findings within the paper.

## Overview

From the late 1960s into the 1990s, many low-income inner-city neighborhoods experienced a stark rise in violent crime. This was especially the case within public housing developments nationwide. Due to institutionally racist policies and practices –such as redlining, the concentration of poor blacks in public housing developments, deindustrialization, and the suburbarbanization of jobs– inner-city neighborhoods experienced increases in joblessness, social disorganization, and crime (Wilson 1987). During this period, the federal government shifted its focus from an anti-poverty to an anti-crime campaign, enforcing increasingly punitive crime control tactics within inner-city neighborhoods. This included the use of aggressive policing practices (e.g., stop and frisk, order maintenance policing) as well as punitive criminal statutes (e.g., the three strikes law[2]) that led to an estrangement from criminal legal institutions within low-income communities of color (see Bell 2017).

In response to the lack of criminal legal protection and strained police-community relations within disadvantaged communities of color, public housing tenants have historically taken it upon themselves to improve safety within their neighborhoods. This has taken place through informal social control mechanisms, such as disciplining each other's' children (e.g., Sampson, Raudenbush, and Earls 1997) as a well as formal mechanisms, including the establishment of tenant patrols. In fact, from the late 1960s to the mid-1970s, tenant patrols were launched in Public Housing Authorities (PHAs) in New York City and Boston among other cities nationwide.

[1] Negotiated coexistence refers to the set rules and expectations formed among law-abiding citizens and offenders living within the same neighborhood (Browning 2009).
[2] The three-strikes law was administered under the Clinton administration in 1994. It indicated that an offender would be receive a life sentence upon being convicted of a federal crime for the third time.

At Bromley-Heath, the first tenant-managed public housing development in the United States, a tenant patrol was established in the late 1960s and institutionalized in 1971 due to a rise in public safety issues, substandard police protection, and concerns of police violence. At the development, drugs, gangs, and violence were among the central public safety issues that left many residents in fear of victimization (TUE 1970). Despite the dangerous living conditions at the Bromley-Heath development, consultants noted that "Boston City police openly neglect[ed] the project, leaving Bromley-Heath even without the protection of the city police patrols" (TUE 1970: 14-15).

Police-tenant relations were characterized by instances of police violence, "attack dogs," and "shotguns" (Cole interview, 1973). In elaborating on strained police-community relations, Milton Cole, founder of the Bromley-Heath tenant patrol, stated:

> We saw the things police did; we saw the attack dogs, the helmets and the shotguns and it got to us. We felt we ought to be able to control things in our environment in order to prevent police aggression. We felt we could take care of our own community and set up the patrol to protect ourselves from the police (see Alex 1973:2).

Thus, it became abundantly clear that tenants not only needed protection from violent offenders, but also "from the police" (Cole interview, 1973). Any efforts to improve public safety needed to come from community members themselves.

The launch of the Bromley-Heath tenant patrol was part of a larger movement toward community-centered approaches to public safety within cities, such as New York City, Boston, and Chicago. Dissatisfied with the quality of security provision in their neighborhoods, tenant patrols addressed public safety issues on their own terms. While the Bromley-Heath patrol was praised for its successful reduction of crime in the 1970s, it received pushback for its allegedly lenient approach to arrests under the direction of tenant leader and Executive Director Mildred Hailey. Thus, this narrative outlines the ways in which the negotiated coexistence between crime-involved and law-abiding tenants can impede community crime control efforts.

**Organizational Approaches to Public Safety**

Within the scope of this study, I focus on the use of arrests and evictions as crime control mechanisms. This study finds that from the 1970s to the 1990s, the Bromley-Heath TMC, a community-controlled organization, took a lenient, rehabilitative approach to public safety. As a result, they prioritized social services over arrests and evictions for criminal offenses. In contrast, the BHA and the BPD used punitive approaches to public safety concerns in alignment with federal, state, and local "tough-on-crime" policies. While the TMC provided an exemplar of community-centered approaches to public safety issues, their lenient disposition resulted in tensions with the Boston Housing Authority and the Boston Police Department.

*Arrests*

Bromley-Heath Patrol

In its formative years (late 1960s-1970s), the Bromley-Heath patrol did not have arresting powers. While Bromley-Heath patrol officers had the option of making citizen's arrests, according to Bill Mallory, TMC patrol field supervisor, the arrests "had to be damn good because of personal liability" (Alex 1973: 48). If the patrol needed to make an arrest, they reported incidents to the Boston Police Department (BPD), using a telephone that had direct access to the BPD's switchboard (Alex 1973; Cole interview 2020). However, due to the strained relations between the BPD and Bromley-Heath tenants following several alleged incidents of police violence, the Bromley-Heath patrol used their discretion in when to involve the BPD in public safety incidents. Thus, the Bromley-Heath patrol mediated encounters between Bromley-Heath tenants and the BPD.

Milton Cole, founder of the Bromley-Heath patrol, explained the patrol's agreement with the BPD in addressing public safety issues. He stated:

> When police responded, we monitored their calls...The police began to respect this and a decision was made by the patrol sergeant to stay out of the area, only coming in when they were needed (Alex 1973: 2).

Incidents that might have otherwise resulted in arrests were mediated by the Bromley-Heath tenant patrol. In fact, in recalling the patrolmen's approach to public safety offenses, Milton Cole argued that the patrol "would try to get the [residents] straightened out before the police got involved and gave them a record" (Cole interview, 2020).

Discrepancies in reported crime incidents between the Bromley-Heath patrol and the BPD support Milton Cole's claims. Between June 1972 to June 1973, despite only operating during the daytime, the Bromley-Heath patrol reported approximately twice as many cases of auto theft, vandalism, and purse snatchings at the Bromley-Heath development as did the Boston Police Department (Alex 1973) (see Table 2 below). Rather than attributing this incongruity to erroneous record keeping, evidence suggests that the patrol did not notify the BPD of every offense that they encountered. For example, in discussing the TMC's approach to crimes, such as theft, one patrolman argued that the patrol gave offenders an ultimatum: return the stolen property or the BPD would be involved (Alex 1973). While returning the stolen property did not mean that the offender was "off the hook," as the victim could still prosecute, it was less likely that the offender would be arrested for the incident (Alex 1973: 36-7).

**Table 2. Reported Crime Incidents at Bromley-Heath development (June 1972-June 1973)**

| | Boston Police Department records | Bromley-Heath Patrol records |
|---|---|---|
| Auto theft | 28 | 56 |
| Vandalism | 5 | 11 |
| Purse Snatching | 12 | 21 |

Retrieved from Alex, William N. 1973. *First Year End Report: Bromley-Heath Community Patrol.* NCJRS 16394. Boston, MA: Boston Mayor's Safe Streets Act Advisory Committee.

In the 1980s and 1990s, the Bromley-Heath police had arresting powers, carried firearms, wore police uniform, and underwent municipal police training. Nonetheless, the patrol allegedly continued to avoid arrests to the dismay of state-controlled institutions. According to Chief Joseph "Joe" Macaluso, "rather than arrest [youth] we [the TMC police] would coordinate with a lot of different agencies, social services, school departments, really trying to ramp down activities before they became major" (Macaluso Interview, 2020).

The Bromley-Heath patrol's anti-arrest, service-oriented approach to criminal offenses stemmed from TMC Executive Director Mildred Hailey. Rather than to encourage arrests for drug possession, for example, Hailey reportedly preferred to send residents dealing with substance abuse to rehab facilities (Kornblut 1998). In support of this claim, Macaluso argued:

> Mildred Hailey wasn't pro-police. She didn't wanna see people get arrested. She worked hand in hand with us [and] she was so far ahead of her time. I used to go to Mildred's office and say, "Mildred, we've lost this generation. Let's move on and try to get the younger ones." It was really that bad. [There was] no child left behind with her. She never gave up on anybody (Macaluso Interview, 2020).

Here, Macaluso importantly suggests that Mildred Hailey had a great degree of influence over the Bromley-Heath patrol's policing philosophy. The desire to give crime-involved residents second chances meant that the patrol was reluctant to enforce arrests.

<u>Boston Police Department</u>

In contrast to the TMC's alleged anti-arrest approach, the Boston Police Department (BPD) reportedly used arrests and other aggressive policing tactics to reduce crime. According to former Commissioner William Evans, during the 1980s, arrest quotas were markers of professional success within the BPD. Evans recalled, "When I first came onto the force, there was a bulletin board where police performance was measured based on how many arrests you made. The best cops were the ones who made the most arrests" (Evans Interview, 2018).

In fact, the BPD was involved in a series of controversial allegations of racialized police violence from the 1970s to the 1990s. In 1975, two white undercover BPD officers shot and killed James Bowden, a 25-year-old black man who was mistaken for a robbery suspect (Terry 1986). In 1989, when Charles Stuart, a White man accused a Black man of killing his pregnant wife, the BPD swept through the predominantly Black Mission Hill projects, a BHA development, allegedly using aggressive tactics and coercing a confession from a Black male

suspect (Walker 1990; Winship and Berrien 1999). The BPD's aggressive policing tactics resulted in a deep-seated mistrust of the police within Boston's African-American communities.

In response to strained police-community relations, as well as the rise in youth homicide in Boston, in the 1990s, the BPD launched Operation Ceasefire, a police partnership with Black clergy members known as the Ten Point Coalition (TPC), city youth gang outreach workers (or "street workers"), the Drug Enforcement Administration (DEA), the Federal Bureau of Investigation (FBI), the Department of Youth Services (DYS), the U.S. Attorney, the Massachusetts Probation Service, and some community-based organizations. The goal of this collaborative, problem-oriented policing approach was to reduce youth violence and drug violations in the city of Boston with assistance from community stakeholders.

While research suggests that Operation Ceasefire effectively reduced violent crime in Boston (Braga, Hureau, and Winship 2008), BPD officers used arrest and prosecution as a tactic to punish noncomplying gang-involved youth. Using the "pulling levers strategy," BPD officers gave gang members an ultimatum: stop engaging in violent crime and drug offenses or "be prosecuted to the full extent of the law" (Winship and Berrien 1999: 56). Following the passage of the 1996 Youth Offender Statute, prosecutors were able to indict youth on felony charges, either through adult sentences or DYS commitments until age 21 (OJDP 1999). To show gang-involved youth that this zero-tolerance approach to crime was legitimate, the BPD's Youth Violent Strike Force arrested noncomplying gang members for minor offenses, such as public drinking and motor vehicle violations (OJJDP 1999). The BPD also conducted warrant sweeps, arresting everyone with outstanding warrants within high-crime areas, especially within BHA public housing developments (Winship and Berrien 1999).

Between 1995 to 1998, BPD arrests for violent crime within BHA public housing developments increased from 39 arrests to 205 arrests (426% increase) (BPD arrest data). Similarly, BPD arrests for drug violations within BHA developments rose from 124 in 1997 to 257 in 1998 (107% increase). This reflected nationwide patterns as drug arrests in the U.S. steadily increased from 580,900 arrests in 1980 to 1,532,200 arrests in 1999 (164% increase).[3]

The concentration of BPD officers in high-crime areas, or hotspots meant that African-Americans were disproportionately arrested for criminal offenses, especially drug violations. Between 1995 to 1999, non-Hispanic Blacks composed over half (56.93%) of drug arrests made within BHA developments (see Table 3). Non-Hispanic Blacks were 3 times more likely to be arrested for a drug violation than their non-Hispanic White counterparts.

[3] Data retrieved from FBI's Uniform Crime Report (https://bjs.ojp.gov/drugs-and-crime-facts/enforcement/arrtot-table).

**Table 3. Drug Arrests (By Race), BHA developments (1995-1999)**

| Charge | Count | Percentage |
|---|---|---|
| Non-Hispanic Black | 337 | 56.93% |
| Non-Hispanic White | 105 | 17.74% |
| Hispanic Black | 64 | 10.81% |
| Hispanic White | 86 | 14.53% |
| TOTAL | 592 | 100% |

Source: Boston Police Department Arrest Data, 1995-1999

Some might attribute the higher arrest rates of non-Hispanic Blacks to the sharp increase in non-White Boston Housing Authority (BHA) residents in the 1990s.[4] However, data suggest that between 1995 to 1997, African-Americans made up 35.5% of the BHA's total tenant population, followed by Whites (34.0%) and Hispanics (27.5%) (Radin 1998). Thus, despite accounting for 35.5% of BHA tenants, non-Hispanic Blacks made up 56.93% of BHA drug arrests. This finding reflects nationwide patterns of racial disparities in drug arrest rates. In 1998, for example, the drug arrest rate for Blacks reached 1,460 per 100,000 in comparison to 365 for Whites (Western 2006:46). Ultimately, the BPD was more prone to arrests within BHA public housing than was the Bromley-Heath patrol.

*Evictions*

Boston Housing Authority

The Boston Housing Authority (BHA) launched its campaign to evict crime-involved tenants after going into receivership in 1980. According to court-appointed receiver Harry Spence, the BHA's lack of evictions of crime-involved tenants "was leading to some very devastating circumstances for other tenants" (Canellos 1989). Spence argued that among BHA tenants, the "atmosphere of fear and expectation of violence and destruction" was so pervasive in some areas of the projects that "no applicant [would] agree to occupy vacant units in those areas and exiting occupants [were] gradually departing" (Taylor 1980).

In his efforts to rid the BHA of "literal anarchy and gross official neglect" (Boston Globe 1980), Spence wrote an affidavit to Superior Court Judge Paul G. Garrity seeking an emergency eviction injunction, which would allow the BHA to evict crime-involved tenants without a grievance panel hearing. Judge Garrity approved this request, granting the BHA the ability to evict tenants "who make threats, commit assaults, damage property or possess drugs…in as few as seven days" (Taylor 1980). For cause evictions –evictions for lease violations— BHA tenants were not allowed a grievance panel and could be evicted without proof of guilt. Management

[4] Data indicate that between 1990 to 1998, the percentage of non-White residents in all Boston Housing Authority family developments increased from approximately 50% to 75% (see Vale 2007: 303).

simply had to "show that the preponderance of evidence suggests that criminal activity occurred" (Harak 1989). To enforce this new legislation, the BHA hired 24 investigators who were placed in 13 of the BHA's 26 housing developments (Dwyer 1982). This marked the beginning of the BHA's tough-on-crime approach to evictions for presumed criminal activity.

In the years following the BHA receivership, federal policies expanded the tough-on-crime agenda within U.S. public housing. In 1988, Congress passed the Anti-Drug Abuse Act, which granted Public Housing Authorities (PHAs) the authority to evict tenants for "any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control" (Umbach 2011: 156-157). Under this legislation, whole families could be evicted "regardless of whether those persons knew or should have known of the conduct of criminal residents" (Heinle 2009: 217). In 1989, the Department of Housing and Urban Development (HUD) passed federal guidelines granting PHAs the ability to "evict tenants for drug use or other criminal activity without convening a grievance panel due to a waiver of federal due process guidelines" (Canellos 1989). While the BHA already had this authority under state guidelines, HUD's ruling allowed PHAs nationwide to take this punitive approach to cause evictions.

Under the punitive eviction policies, the BHA's eviction of crime involved tenants steadily grew. In 1988, the BHA set a record for evictions of "153 families for alleged drug use, assaults, weapons possession or some other criminal activity" (Canellos 1989). From 1994 to 1998, BHA eviction cases increased from 729 to 952 families (30.59% increase) (Rakowsky 1998b). From 1995 to 1997, the BHA evicted 179 families for "civil rights, drug, or violent offenses" (Radin 1998). Of those 179 families, 60 (33.5%) were White, 75 (42%) were Black, and 63 (35%) were Hispanic (Radin 1998). The percentages not caused by the head of household are as follows: 19.5% White, 44.5% Black, and 35.0% Hispanic. Data suggest that racial composition of evicted tenants was roughly proportionate to the racial composition of the BHA's tenant population, which was 34% White, 35.5% Black, and 27.5% Hispanic (Radin 1998). Most evictions occurred at the BHA's largest developments, including Old Colony, Mary Ellen McCormack, and Bunker Hill (Radin 1998).

In response to the rise in evictions, tenant advocates argued that not only did the eviction guidelines violate tenants' civil rights, but also left many evicted public housing residents homeless. In Boston Housing Court, for example, "judges would sometimes say things like, 'Well if I evict them, where will they live?' or 'No other landlord wants to take them, so you guys have to'" (Henriquez Interview, 2020). BHA officials retorted that cause evictions were necessary to protect law-abiding tenants whose safety and quality of life were compromised. For example, Thomas O'Loughlin, 1980s chief of BHA investigators, stated, "Sure you can be concerned, but to leave [crime-involved tenants] there is to punish the other families. Poor people don't have money. They can't pack up and move to Wellesley if a drug pusher is living

next door to them" (Dwyer 1982). BHA Administrator Sandra Henriquez argued that the strict eviction guidelines "began to send a signal that [the BHA] is not the housing of last resort," indicating that crime involved tenants and their families would not receive sympathetic treatment simply because they had nowhere else to go (Henriquez Interview, 2020).

Bromley-Heath TMC

In sharp contrast to the Boston Housing Authority (BHA)'s punitive approach to evictions, the Bromley-Heath Tenant Management Corporation (TMC) maintained a lenient approach to evictions. Following the Anti-Drug Abuse Act of 1988, while BHA evictions hit a record high, TMC evictions decreased by approximately 71.43% (Canellos 1989). Similarly, while the number of BHA eviction cases rose between 1994 to 1998, the Bromley-Heath TMC sought "only a handful of evictions…against drug offenders" (Rakowsky 1998b). Bromley-Heath TMC evictions reached a peak in 1995 "with 25 cases for nonpayment and nuisance crimes" (Rakowsky 1998b). In contrast to the comparatively sized BHA-managed Bunker Hill development, which had 302 evictions (77 drug-related) filed between 1997 to 1998, Bromley-Heath TMC only sought 27 evictions (4 drug-related) during this period (Rakowsky 1998b).

Following the 1998 drug raid at Bromley-Heath, the TMC faced backlash for its alleged soft approach to evictions. BHA Administrator Sandra Henriquez argued that the TMC was not enforcing the "one strike and you're out" policy, stating, "Drug evictions didn't happen here…this is a major bust. What happens here if the most serious lease violations don't get acted upon?" (Rakowsky 1998a). BHA chief of staff Hillary Jones rhetorically asked, "Why should law-abiding people living in public housing have to put up with bad actors because some tenant group thinks the law is too harsh?" (Rakowsky 1998a).

In addition to BHA officials, police officers alleged that despite making repeated arrests of drug dealers, the TMC "often refused to evict the offenders" (Robertson 1998). One former police officer stated, "Mildred was easy to hold off on evictions. I told her, 'For every bad tenant, you lose five good tenants'" (Police interview, 2020). Nonetheless, the TMC allegedly continued to prioritize alternatives to eviction largely due to the social ties between TMC staff and Bromley-Heath residents.

According to Bromley-Heath TMC staff, the TMC's lenient approach to evictions was rooted in managements' loyalties to and concern for Bromley-Heath residents. Before making an eviction, the TMC allegedly took into consideration the impact that eviction would have on the crime-involved tenant's law-abiding relatives (TMC Interview, 2020).

> **TMC staff member (Julie):** There was an edict by HUD that if [residents] were found guilty of a crime, then it was mandated by law that they should be evicted and unfortunately, it didn't always happen.
> **Interviewer (Jasmine):** Do you know why that was the case?

> **TMC staff member (Julie):** Why people didn't get evicted? Probably because of familial loyalties. Sometimes we closed our eyes, especially if it was going to just to disrupt families. I'm not saying it's right or wrong.

Julie's narrative importantly suggests that in contrast to the BHA's reported lack of concern for how eviction would impact families, the TMC considered alternatives to eviction because of their "familial loyalties" to fellow residents. Giving Bromley-Heath residents second, third, and sometimes even fourth chances was embedded into the fabric of Bromley-Heath TMC management. This was at odds with HUD's one-strike policy, which indicated that crime-involved tenants and their families should be evicted after the first offense.

As an alternative to eviction, the TMC preferred to connect tenants with needs-based services. In the case of drug violations, for example, Bromley-Heath assistant manager Denise Ellis argued that the TMC tried to "talk to the person and try to get them into a program" (Canellos 1989). Similarly, Bromley-Heath manager David Worrell argued that the TMC's approach was "to work with people to see if drug treatment or job training would help" (Rakowsky 1998b). After a Bromley-Heath tenant was arrested, rather than evicting the family, the TMC allegedly removed "the name of an offending tenant from the lease" (Rakowsky 1998b). Bromley-Heath TMC lawyer Steve Weil stated that the TMC "often asked the court to order the offending tenant to stay off the property for up to a year" (Rakowsky 1998b).

While there were allegedly several success stories from the TMC's rehabilitative approach to evictions, there were also some concerning accounts that led the BHA to question the TMC's ability to effectively manage the development. For example, Shaka Buford, an 18-yr old who was arrested "three times on felony charges in 1995," was ordered to stay off Bromley-Heath property, including his mother's apartment within the development (Rakowsky 1998b). However, Buford allegedly did not comply with this sanction and was arrested in 1996 for "chasing a man through the Jackson Square T stop [neighboring the Bromley-Heath development], allegedly armed with three kitchen knives" (Rakowsky 1998b). Still, an eviction was not pursued. Buford was given a last chance agreement where he "had to sign a court order promising not to break the law on Bromley-Heath grounds" (Rakowsky 1998b). He was arrested during the 1998 drug raid at "4 am in his mother's apartment" but "no moves had been made [by the TMC] to evict his family" (Rakowsky 1998b). When the BHA took control of management, the management company vowed to pursue eviction procedures "against the 38 residents indicted on federal drug charges in addition to 20 others whose cases were said to be languishing under tenant managers" (Rakowsky 1998a). The TMC's divergence from federal and state eviction guidelines would provoke tensions with the BHA for years to come.

**Conclusion**

This study sought to examine the ways in which negotiated coexistence shapes institutional approaches to public safety concerns. With the rise in punitive legislation, Law Enforcement Agencies (LEAs), such as the Boston Police Department (BPD), and Public Housing Authorities (PHAs), such as the Boston Housing Authority (BHA) took tough-on-crime approaches to criminal offenses. Evictions and arrests were central to state-controlled institutions' crime control efforts.

Despite being held to the same guidelines, the Bromley-Heath TMC reportedly took a rehabilitative approach to crime, providing needs-based services and other alternatives to evictions and arrests. This, I argue, was in large part due to the TMC's loyalties to Bromley-Heath residents, many whom were neighbors, family members, and friends. While the strong ties between TMC staff and residents had its advantages, it also caused strife with the BHA.

At the root of the tension between state- and community-controlled institutional approaches to public safety was the notion of deservingness. In other words, how many chances do public housing tenants deserve for their infractions? While the BHA and the BPD perceived the TMC as giving tenants too many chances, the TMC perceived the BHA and the BPD as not giving tenants enough chances. The lack of agreement among these actors led to the one-year takeover of the Bromley-Heath development and the permanent dissolution of the Bromley-Heath police force.

Today, with the calls for the reimagining of public safety, scholars and policymakers would be wise to learn from the history of the Bromley-Heath TMC. To be sure, the TMC's approach to public safety had its flaws. Nonetheless, the TMC adopted a rehabilitative approach to crime decades before the state acknowledged the severe consequences of its tough-on-crime approach. The successes and pitfalls of the Bromley-Heath TMC can help provide scholars and policymakers with a roadmap on paths to consider, as well as paths to avoid in the development of community-oriented approaches to public safety.

**Sources Cited**

Alex, William N. 1973. *Bromley-Heath (MA) Community Patrol- Exemplary Project Evaluation Report.* NCJRS 16393. Boston Mayor's Safe Streets Act Advisory Committee.

Bell, Monica C. 2017. "Police Reform and the Dismantling of Legal Estrangement." *Yale LJ* 126:2054–2222.

Browning, Christopher R. 2009. "Illuminating the Downside of Social Capital: Negotiated Coexistence, Property Crime, and Disorder in Urban Neighborhoods." *American Behavioral Scientist* 52(11):1556–78.

Canellos, Peter S. 1989. "State May Evict Criminal Tenants under New Rules." *The Boston Globe*, April 20.

Dwyer, Timothy. 1982. "Eviction Becomes a Key to Making Projects Livable." *The Boston Globe*, February 2.

Harak, Charles. 1989. "Many Tenants Will Be Hurt by HUD's Move." *The Boston Globe*, May 22.

Heinle, Timothy E. 2009. "Guilty by Association: What the Decision in Boston Housing Authority v. Garcia Means for the Innocent Family Members of Criminal Living in Public Housing in Massachusetts." *New England Journal on Criminal and Civil Confinement* 35(1):213–41.

Kornblut, Anne. 1998. "Bromley-Heath Officers Cite Lack of Support." *The Boston Globe*, November 24, B1, B6.

Office of Juvenile Justice and Delinquency Prevention (OJJDP). 1999. *Promising Strategies to Reduce Gun Violence*. Washington, D.C.

Radin, Charles A. 1998. "BHA's Eviction Statistics Rebut Critics." *The Boston Globe*, January 27.

Rakowsky, Judy. 1998a. "Bromley Director Could Face Eviction under '1 Strike' Rule." *The Boston Globe*, November 3.

Rakowsky, Judy. 1998b. "Drug Evictions Rare at Bromley." *The Boston Globe*, December 28.

Robertson, Tatsha. 1998. "A Matriarch Sees Family Splinter." *The Boston Globe*, November 9.

Sampson, Robert J., Stephen W. Raudenbush, and Felton Earls. 1997. "Neighborhoods and Violent Crime: A Multilevel Study of Collective Efficacy." *Science* 277(5328):918–24.

Taylor, Jeffrey. 1980. "BHA Gets a Tenant Eviction Procedure." *The Boston Globe*, November 31.

Terry, Clifford. 1986. "Deadly Force Comes Alive in Scary Tale." *The Chicago Tribune*, April 9.

Trans Urban East, Inc. (TUE). 1970. *Final Report Regarding the Feasibility of Tenant Management at Bromley-Heath Development*. New York: Trans Urban East, Inc.

Umbach, Gregory Holcomb. 2011. *The Last Neighborhood Cops: The Rise and Fall of Community Policing in New York Public Housing*. New Brunswick, N.J: Rutgers University Press.

Vale, Lawrence J. 2007. *From the Puritans to the Projects*. Cambridge, MA: Harvard University Press.

Walker, Adrian. 1990. "Bromley-Heath Tenants Try to Aid Investigation." *The Boston Globe*, September 18.

Western, Bruce. 2006. *Punishment and Inequality in America*. New York: Russell Sage Foundation.

Wilson, William Julius. 1987. *The Truly Disadvantaged: The Inner City, the Underclass and Public Policy*. Chicago, IL: University of Chicago Press.

Winship, Christopher, and Jenny Berrien. 1999. "Boston Cops and Black Churches." *The Public Interest* 136:52–68.